UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

In re:                                               Chapter 11

Alexander Bernard Kaspar,

                                                     Case No.: 22-10382-mg


                            Debtor.

---------------------------------------------------------x

### DEBTOR'S RESPONSE TO THE ORDER TO SHOW CAUSE OF THE COURT

**TO:    THE HONORABLE MARTIN GLENN**
**        UNITED STATES BANKRUPTCY CHIEF JUDGE**

      Alexander Bernard Kaspar, the above-captioned debtor and debtor-in-possession ("Debtor"), by and through his attorneys, M. Cabrera & Associates, P.C., hereby submits this response (the "Response") to the Order to Show Cause wherein the Court ordered the Debtor show cause why his case should not be converted to a case under chapter 7, or, in the alternative, why a chapter 11 trustee should not be appointed.    The Debtor opposes any conversion or appointment of a chapter 11 trustee and respectfully submits the following Response to the Court as to why said relief should not be ordered:

### PRELIMINARY STATEMENT

      1.    The Debtor is in compliance with his obligations under Chapter 11 in his current bankruptcy case.  Moreover, despite what other parties may have represented to the Court, the Debtor was in compliance with his obligations under Chapter 11 in his prior bankruptcy case.  The Debtor filed his petition in good faith and if not for the actions of the Town of Putnam Valley (the "Town"), the Debtor would be further along in this case, including the likely full remediation of the subject property and the sale of the remaining two parcels of land.  The Town has interfered with the starting of the remediation process by adding onerous and unnecessary requirements before work can begin.  The Town has interfered with the sale of the Debtor's property, by spreading false statements to brokers and

real estate agents who call the Town for information on the properties.  This was done by the Town in the last bankruptcy case delaying the sale of the properties.  The Debtor had to file an Order to Show Cause to stop the improper behavior of the Town and its various employees. The Town has intimidated and interfered with the Tenants on the Debtor's property by harassing the Tenants at every turn by threatening the issuance of nuisance violations and actually issuing nuisance violations causing the Tenants to simply leave to avoid the nonsense.  The Town threatened Tenants of the Debtor in the last bankruptcy case by refusing to conduct further business with them if they became Tenants of the Debtor.

2.      The Debtor has operated as a Debtor in Possession in this case and has complied with the requirements to timely file monthly operating reports.  The Debtor has proceeded in resolving the dispute with Thornburg Mortgage Securities Trust 2006-5, U.S. Bank National Association, as Trustee, serviced by Specialized Loan Servicing, LLC ("SLS"), the secured mortgage holder for the Gilbert Lane property, by negotiating a short sale with the lender and then finding a buyer for the property.  The Debtor has made significant progress in finding a buyer for another parcel of land that will provide funding for the remediation and funding for a plan distribution.  The Debtor has done all of this at little or no cost to the Estate.

3.      The Debtor should be allowed to continue as a Debtor in Possession, file and approve a Plan and close out the case.  The Debtor continuing the case is in the best interests of the Estate and the creditors. With the Debtor in charge the costs to the Estate will be significantly less than a conversion to a Chapter 7 case or the introduction of a Chapter 11 Trustee.

## **PROCEDURAL HISTORY**

4.      The Debtor filed the subject bankruptcy petition on March 29, 2022.

5.      To date, the Debtor has continued in possession of his property and the management of his business affairs as a debtor-in-possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has been appointed in this Chapter 11 case.

6.      The Town filed a Motion to Dismiss the Debtor's bankruptcy on January 24, 2023, wherein it alleged that the Debtor failed to disclose financial information and intentionally violated a Court Order.

7.      Following a brief hearing on the Town's Motion, the Court issued the within Order to Show Cause.

## **THE ORDER TO SHOW CAUSE AND THE RECITATIONS THEREIN**

8.      In the Order to Show Cause, the Court makes several statements that are inaccurate which, if left unaddressed, are extremely prejudicial to the Debtor.  With all due deference to the Court, the Debtor would note as follows:

  a.    During the Debtor's first bankruptcy proceeding, Case No.: 18-36862-cgm, the Debtor, through Counsel, filed **fifty-four** (54) monthly operating reports. This number includes several amended filings.  The Court was mistaken when it stated that the Debtor "never filed ***any*** operating reports."  See OTSC, pg. 1.

  b.    The Debtor's monthly operating reports included disclosures about all monthly income and disbursements.  The assertion in the Order to Show Cause that there "has never been any disclosures about the disbursements made during the case" is completely inaccurate.  See OTSC, pg. 2.

9.      In addition, while the Debtor acknowledges that he did not file a proposed Chapter 11 Plan in his the prior proceeding, it should further be noted that the Court never set down an Order which directed the Debtor to file a plan and the Debtor had time to file a do such.

10.     To the extent that the circumstances of the dismissal of the Debtor's prior bankruptcy are relevant, I would also note that the Trustee's motion to dismiss, filed a week before Christmas, was adjourned only once to February 1, 2021 – because of the holidays – to allow the Debtor sufficient time to file opposition.  Consent was obtained for the adjournment.

11.     Thereafter the Debtor, through Counsel, filed said opposition to the motion to dismiss, only to later withdraw the same because, *at that time*, the Debtor believed, albeit mistakenly, that since he had sufficient monies to fund the remediation of the ranch property, the Town would allow him to start and complete the process, already approved by the State, without the need for further oversight from the bankruptcy court.

12.     With respect to the Dismissal Order, neither the Debtor nor Counsel disputes the requirements of the Order.  The Order of dismissal for the case was filed on February 3, 2022, and the case was closed on February 4, 2022. The Debtor did not file a monthly operating report for January of 2022.  Present Counsel acknowledges that there was an oversight with respect to the requirements of the dismissal order, and an Affidavit of disbursements for the month of January 2022 was not filed within 10 days of the dismissal of the case, but Counsel was in contact with the Trustee's office regarding the disbursements for the month of January 2022 for the purposes of computing a final bill.  As in other Chapter 11 cases, Counsel kept in contact with the Trustee's office to confirm the establishment of and the payment of the final quarterly fees.

13.     Upon information and belief, Counsel provided the disbursement figures to the Trustee's office.  A final bill was produced by the Trustee's office and forwarded to the Debtor.  The Debtor paid that final quarterly bill to the U.S. Trustee's Office.

14.     Albeit late at this point, Counsel has drafted and filed on the docket of case 18-36862 an affidavit of disbursements for January of 2022, for the Debtor (See **Exhibit A**).  Counsel forwarded a copy of this affidavit of disbursements to the current Trustee in this case prior to filing it on the docket of the prior case.

15.     With respect to the sale order, Counsel believes that he complied with the Order to the extent possible taking into consideration the dismissal and closure of the case and the events occurring at that time.  Funds from the sale were wired to Counsel's escrow account immediately after the sale.

4

These funds were kept in Counsel's escrow account from December of 2021 until after the case was dismissed and closed in February of 2022.

16.     Approval of the remediation plan from the New York State Department of Environmental Conservation ("NYSDEC") was obtained by the Debtor and Environmental Consulting and Management Services ("ECMS") prior to the case being dismissed (See **Exhibit B**).  The Debtor and ECMS were approved to begin remediation.  Representatives from ECMS attended a meeting with the Town of Putnam Valley (the "Town") on January 26, 2022, to advise the Town of their intentions to immediately begin remediation as directed by the NYSDEC per the approval notice.  At said meeting the Town advised ECMS and the Debtor, for the first time, of additional onerous and unnecessary requirements that they would have to comply with and satisfy prior to beginning the remediation process.  The initial cost estimates for these new requirements were estimated by the Debtor and ECMS at the time to potentially exceed one hundred thousand dollars.

17.     The hearing on the motion to dismiss the case was heard on February 1, 2022.  At that hearing and after the Debtor's opposition was withdrawn, the case was dismissed by Judge Morris.  The dismissal Order was docketed on February 3, 2022, and the case was closed on February 4, 2022.

18.     Counsel advised the Debtor to cease use of the DIP account and to close the DIP account as part of the closure of the case upon the clearance of all outstanding checks.  Subsequent conversations were had between the Debtor, ECMS, Counsel and Ms. De Libero regarding the steps now needed to begin the remediation process.  It was decided that due in part to the need for immediate funds to attempt to comply with the new requirements introduced by the Town and that the Debtor was closing the DIP account, that the funds from Counsel's escrow account would be turned over to the Debtor and Ms. De Libero in separate disbursements to accounts upon their direction.

19.     After further conversations with the Debtor about the fraudulent land violations issued against the ranch property in May and June of 2020, relied upon by the Town at the January meeting to

justify some of the new requirements and how the Town also used those fraudulent land violations to stall the beginning of the remediation process all together, the Debtor and Ms. De Libero agreed to pay the firm $4500.00 to pursue legal representation to dismiss those violations thereby removing from the Town's unsubstantiated hurdles and quickly clearing a path to beginning the remediation process. Debtor and Counsel decided that instead of issuing a wire payment to the Debtor's DIP account, incurring a fee for such and then the Debtor writing a check from the DIP account back to the firm, thereby delaying its closing, that Counsel should take the payment from the escrow account directly as a convenience and a way to avoid additional fees and time.

20.     A wire was sent to Ms. De Libero in the amount of $276,100.00, an amount calculated to be the remaining amount in Counsel's escrow account from the sale.  After further review, Counsel overpaid Ms. De Libero by $630.00 (a $500 addition error and a $30 wire fee).

21.     Counsel was aware that the Debtor had received $153,200.68 as part of the sale of the two parcels of land at the end of December of 2021.  The Debtor received these funds from the sale to fund the DIP account and Counsel directed these funds be turned over to the Debtor to have funds to pay the ongoing expenses of the case including taxes and administrative expenses.  Counsel believed that the Debtor had sufficient funds in the DIP account to pay the agreed upon counsel fees that had already been approved by the Court.  As with the payment of the fees above, the Debtor and Counsel decided that Counsel issue a payment from the escrow money directly to the firm for the payment of fees rather than disburse those funds to the Debtor and then the Debtor reissuing a check back to Counsel.

**The December 2021 Sale Order and the Escrow Proceeds**

22.     With respect to the terms of the December sale order, and the specific terms of the same, including those specific provisions which required Counsel to retain the majority of the sale proceeds in escrow, it is necessary to provide the Court a background of the negotiations and eventual sale of parcels 72.19-1-29 and 83.1-1.

23.    The Debtor owned five parcels with Grace De Libero ("Ms. De Libero"). The ownership of the parcels was 50/50.  Ms. De Libero understood the need to liquidate the properties to raise funds for the future remediation and also to end the ongoing property tax accumulation.

24.    The Debtor and Ms. De Libero had their hands tied since 2012 due to a receiver being installed on the properties.  During the time from 2012-2018, the receiver failed to extend the agricultural tax rebate on the properties thereby exposing them to assessment on the full taxable value of the properties.

25.    The Debtor and Ms. DeLibero were further foreclosed from running the ranch on the property which was a previous source of income for them.  The receiver allowed an individual to run the ranch and pay $1000 per month.  The Debtor and Ms. DeLibero were receiving five to six times this amount prior to this new agreement entered into by the receiver.

26.    The Debtor and Ms. De Libero were forced to sit by and watch as year after year the receiver failed to pay the property taxes on any of the parcels.

27.    The mortgage holder on the Gilbert Lane property filed a foreclosure action that resulted in a judgment being entered against the Debtor and Ms. De Libero.  Facing an immediate foreclosure sale, as well as other matters, the Debtor filed the first chapter 11 filing in 2018.

28.    During case number 18-36862 the Debtor was able to find a buyer for two parcels of land.  The original motion, drafted by Counsel, to approve the sale of those parcels did not include the affirmative approval of Ms. De Libero to the sale.  The Buyer contacted Counsel and conversations were had discussing the inclusion of Ms. De Libero's affirmative approval for the sale.

29.    Conversations were then had with Ms. De Libero regarding the inclusion of her affirmative approval and such was added to the motion.

30.    Further discussions were had with the Buyer, Ms. De Libero and the Debtor regarding the distribution of the sale proceeds to Ms. De Libero.  Initially Ms. De Libero wanted all her funds

7

distributed to her from the sale at the closing. Her reasoning behind this demand was that Ms. De Libero had funded the payment of the property taxes in the summer and fall of 2021 in amount of exceeding $110,000.00 and wanted her money back.

31.     Ms. De Libero paid the property taxes out of her own money as an incentive to Putnam County to allow the Debtor more time to continue in the bankruptcy and sell the remaining parcels to extinguish all the outstanding property taxes. After extensive conversations with the Debtor and Ms. De Libero, several decisions were made.

32.     The first decision was that it was in the best interests of the Debtor, Ms. De Libero and the estate that sale motion be approved at this point in the case.

33.     Second, that after discussions with ECMS their heightened estimate of $400,000 would be the basis for the remediation costs and not estimates prepared by the Debtor that were $100,000 to $150,000 less. The Debtor, Counsel and Ms. De Libero agreed that to show good faith to the Town, the Court, the Trustee and to further the bankruptcy case that money would be set aside to show the ability to fund the highest cost estimate for remediation.

34.     It was never a thought to Counsel, the Debtor or Ms. De Libero that the case would in essence be dismissed within thirty days from the sale being approved. Had Ms. De Libero known of such a possibility, she would never have consented to the withholding of her sale proceeds.

35.      Counsel can only guess as to whether or not the sale motion would have been approved with the clause regarding the remediation money. It was never the intention of the Debtor or Ms. De Libero to tie up the sale proceeds without having the ability to continue to oversee and manage the estate within an active bankruptcy.

36.     It now falls upon Counsel to acknowledge his unartful drafting of the sale and the absence of language regarding the event of dismissal and how such would affect the remediation money set aside for use within an active bankruptcy.

37.     After a delay in receiving the closing documents from the closing attorney for the Debtor, Counsel filed a notice of sale and closing statement on January 29, 2022, which included as Exhibit A, a copy of the closing statement prepared for the closing (See **Exhibit C**).  The closing statement clearly states a wire was sent to Matthew Cabrera, Esq., in the amount of $400,000.00 on December 28, 2021. The funds from the sale of parcel were sent directly into Counsel's escrow account on December 28, 2021, as a wire from SMPR Title Agency (See **Exhibit D**).

38.     The funds stayed in the escrow account for the remainder of December of 2021 and the entire month of January of 2022 and were not released until three disbursements were made after the case was closed in February of 2022 (See **Exhibit E**).

39.     Counsel is of the belief that taking into consideration the dismissal and closure of the case, the fact the Debtor was advised to close his DIP account and the belief that the account was closed or about to be closed, the fact that the Debtor had already received authority from the NYSDEC to start remediation, that the Debtor needed immediate funds to attempt to comply with new requirements being imposed by the Town, that Counsel believed and had reason to believe that the disbursement to Ms. De Libero was going to be used to begin the remediation process, that the small disbursement, after approval from the Debtor, was necessary to accelerate the beginning of the remediation process, and that Counsel believed that the Debtor had sufficient funds, from the prior sale distribution and had the approval of the Debtor to pay Counsel, Counsel disbursed funds to Counsel instead of the Debtor in furtherance of and in compliance with the intent of the Sale Order.

40.     At this point in the case no conferences had been held and no hearings had been held on how the Debtor and ECMS were going to remediate the property or even how the whole process would unfold.  Nothing was written as to when or how workers, contractors other needed professionals would be hired or how and when they would be paid. There had been no discussions on how any money would be distributed to the Debtor or ECMS to accomplish this task.

41.     It was the intention of the Debtor and ECMS to have such conferences or hearings so that the Court and all those involved would have a clear path to begin and continue the oversight and management of the remediation.  The case was dismissed and closed by the Court before any of this needed infrastructure could be created.

42.     This subject was already brought up in this case during the hearing for the retention of ECMS.  Similar concerns were raised regarding how the process would progress, who would directly oversee the workers, contractors and needed professionals and how or when funds would be disbursed or paid.  It was decided that such a discussion would be best held at a future time.

43.     Counsel again acknowledges that the statement regarding the remediation money was unartfully drafted.  Without a clear concise detailed plan on how the Court, the Debtor and ECMS would oversee and manage the remediation, it was a mistake to include the statement in the Sale Order.

44.     Counsel, the Debtor and Ms. De Libero attempted to move forward after the dismissal and closing of the case in the best way they could and with the intention of continuing to oversee the properties and begin remediation of the ranch property.

**I.     Dismissal of a Chapter 11 Case**

45.     Section 1112 of the Bankruptcy Code governs the conversion or dismissal of a case under chapter 11.  It states, in part, that:

> the court shall convert a case under this chapter to a case under chapter 7 or dismiss case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or examiner is in the best interests of creditors and the estate.

46.     Accordingly, the first step in the analysis is to determine whether cause exists to dismiss or convert the Chapter 11 case, and then, if so, determine whether conversion to a chapter 7 or the dismissal is in the best interests of the creditors and the estate.

47.     If cause is established under 1112(b)(1), the case shall be dismissed or converted unless the Court specifically finds unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate pursuant to 1112(b)(2).

48.     Section 1112(b)(2) places the burden of proof of demonstrating such special circumstances on the debtor and the bankruptcy court has "wide discretion" to determine whether cause exists to dismiss or convert a chapter 11 case under Section 1112(b). *In re BH S&B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010).

49.     11 U.S.C. § 1112(b)(4) sets forth sixteen, non-exclusive examples of "cause" for relief under § 1112(b). *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997). The factors enumerated in § 1112(b)(4) are only examples of "cause" under the statute. They are not considered exhaustive and courts are free to consider other factors.  See *In re BH S&B Holdings, LLC*, *supra* 439 B.R. at 346 (Bankr. S.D.N.Y. 2010) (citing *In re Ameribuild Const. Mgmt., Inc.*, 399 B.R. 129, 131 n.3 (Bankr. S.D.N.Y. 2009).

50.     Bad faith is not listed among the examples of 'cause' listed in § 1112(b)(4); however, it is established that the filing of a bankruptcy petition in bad faith constitutes 'cause' for dismissal or conversion of a case under the Bankruptcy Code section 1112(b).  *In re GEL, LLC*, 495 B.R. 240, 246 (Bankr. E.D.N.Y. 2012).

51.     However, the threshold for a determination of bad faith is high, and a "[d]ismissal for bad-faith filing should ordinarily be restricted to those instances where it can be clearly and convincingly shown that a debtor filed . . . to accomplish an otherwise unlawful purpose through use of the Bankruptcy Code." *In re G.A.F. Seelig, Inc.*, No.: 17-46968-ESS (Bankr. E.D. N.Y. 2020)(citing *Carolin Corp. v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989).

52.     In the Second Circuit, a petition will be found to have filed in bad faith if, on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings. *Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.),* 931 F.2d 222, 227 (2d Cir. 1991).

53.     The moving party bears the burden of establishing cause for dismissal under § 1112(b) and must show both the objective futility of the reorganization process and the subjective bad faith in filing the petition are found. *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009).

54.     "'If the movant is able to meet both the objective and subjective prongs, a rebuttable presumption of bad faith arises and the burden then shifts to the debtor to establish good and sufficient reasons why the relief should not be granted.'" *Squires Motel, LLC v. Gance (Squires Motel, LLC)*, 426 B.R. 29, 34 (N.D.N.Y. 2010)(quoting *California Mortg. Serv. v. Yukon Enters., Inc. (In re Yukon Enter., Inc.),* 39 B.R. 919, 921 (Bankr. C.D. Cal. 1984)).

55.     In addition to the various reasons listed under 11 U.S.C. 1112(b), the Second Circuit has identified several factors for courts to consider which would assist in determining whether the debtor, under the totality of the circumstances, had a genuine intent to reorganize or a reasonable prospect of emerging successfully from bankruptcy.  These include:

(1)     the debtor has only one asset;

(2)     the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3)     the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4)     the debtor's financial condition is, in essence, a two-party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5)     the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6)     the debtor has little or no cash flow;

(7)     the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8)     the debtor has no employees.

*C-TC 9th Ave. P'shp v. Norton Co. (In re C-TC 9th Ave. P'shp)*, 113 F.3d 1304, 1311 (2d Cir. 1997)(citing *Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.*, 139 B.R. 828, 832 (W.D.Ky.1992).

56.     In considering each of these factors in turn:

(1) <u>Whether the Debtor had only one asset</u>: At the time of the Debtor's filing of the petition, the Debtor had multiple assets, including his property at 33 Gilbert Lane.  SLS had a foreclosure judgment against said Property which the Debtor sought to address with the filing of the bankruptcy; the Debtor also maintained multiple parcels of Property and is undertaking efforts to sell the remaining parcels to further fund the remediation of the remaining parcel and fund a plan of reorganization.

(2) <u>Whether the Debtor had few unsecured claims in comparison to the secured creditors</u>:  the Debtor listed various unsecured claims, including the amount allegedly owed to the receiver as well as the receiver's attorney fees.  Moreover, the claims alleged due to the Town are contingent unsecured claims.  The amounts, as claimed, are significant, considering the Debtor's financial circumstances.

(3) <u>Whether the Debtor's one asset is the subject of a foreclosure action</u>:  The Debtor acknowledges that one of his Properties was the subject of a pending foreclosure.  However, the Debtor was able to successfully address this foreclosure action by filing his Chapter 11 case – as he has subsequently negotiated a short sale with SLS, found a buyer and sold the Property satisfying the claim held by SLS.  This is not evidence of bad faith. The <u>events</u> surrounding this property demonstrate a proper reason for a Debtor to file for bankruptcy protection and a beneficial

outcome was achieved for the estate, the Debtor and SLS, by utilizing the bankruptcy process as it was intended.

(4) <u>Whether the Debtor's Financial Condition is, in essence, a two party dispute between the Debtor and secured creditors which can be resolved in the pending foreclosure action:</u>   The Debtor has demonstrated that his financial condition is the result of years of unpaid property taxes, due in part to the failures of a court appointed receiver, the costs of that court appointed receiver and his legal counsel and costs to remediate one of his Properties.   There is no pending foreclosure action related to the remaining parcels of Property which would resolve the dispute between the Debtor and the NYSDEC. The Town has injected itself into the dispute between the Debtor and the NYSDEC by filing a contingent claim for supposed costs of remediation, if and only if, the Debtor fails to remediate the property and the Town actually takes action to remediate the property[1].

(5) <u>The Timing of the Debtor's filing Evidenced an Intent to Delay the Efforts of a Secured Creditor to Enforce its Rights:</u>   The Town is not a secured creditor in this case.  As evidenced in its Proof of Claims (claim nos. 5 + 6), the Town does not claim that its alleged claim is secured. The only secured creditor in the case was SLS. SLS already had a foreclosure judgment.

(6) <u>The Debtor has little or no cash flow:</u>  The Debtor receives monthly cash sufficient to pay his living expenses and any fees owed to the U.S. Trustee's Office.  The Debtor and Ms. De Libero continue to stay current on all property taxes owed to the Putnam County.  Further, the Debtor's cash flow will be supplemented by the anticipated sale of the remaining parcels of property.

---

[1] An action the Town has refused and failed to take in over nine years while the property languished under the control of an inept receiver all the while the Town trumpeting to anyone that would listen that he property was a hazardous dump site when in fact the Town never provided a shred of proof of such a situation actually existing in any of its thousands of pages of court filings, Local Court, State Court or Bankruptcy Court. The Town has also failed to exercise its police authority to remediate the property during the Debtor's prior bankruptcy case or the current bankruptcy case.

(7) <u>The Debtor can't meet his current expenses including the payment of personal property and real estate taxes</u>:  The Debtor is meeting his current living expenses and with the assistance of Ms. De Libero and the sale of property of the estate the Debtor is paying his current real estate tax liabilities.  It should be noted that the only time real estate taxes are paid on the Properties of the Estate, is when the Debtor is in control of the estate.  The Debtor is also up to date with the filing and payment of all personal taxes.

(8) <u>The debtor has no employees</u>:  the Debtor admittedly does not have any employees, however, this factor, on its own, is not evidence of bad faith.

57.    A dismissal for bad faith involves "bankruptcy court's exercise of equitable discretion" and the Court has broad discretion in its determination of the same.  See *In re 167 W. 133rd St. Hous. Dev. Fund Corp.* (Bankr. S.D.N.Y. 2018).

58.    Based on the above factors having failed to show the bad faith of the Debtor, it is respectfully submitted that there is no basis for the dismissal of the Debtor's Chapter 11 case under 1112(b).

59.    That debtor has made progress toward selling the remaining large parcel of land.  At current, the Debtor is awaiting an offer of sale from the buyer of the prior two parcels.  A recent appraisal was done on the property by the prospective buyer and the Debtor is awaiting a written offer based upon that appraisal.  The value of the property is in the range of $500,000 to $700,000.  Upon the sale of this parcel, the Debtor will receive all the necessary funds needed to fund the remediation, pay closing costs and fund a plan to pay his administrative expenses and completely pay the unsecured creditors.

60.    Dismissal of the case is not in the best interests of the estate or the creditors.  Dismissal of this case would place the estate back into the hands of an inept and incompetent receiver who has

15

demonstrated on numerous occasions in the past to be incapable of managing the properties and overseeing the remediation of the ranch property.

## II.      The Test to Dismiss or Convert a Chapter 11 to a Chapter 7

61.    If a party "Once a party establishes cause, a court must examine whether dismissal or conversion of a case under chapter 7 is in the best interests of the creditors and the estate. 7 COLLIER ON Bankruptcy ¶ 1112.04[6].

62.    Courts consider multiple factors in determining which action better serves the interests of creditors and the estate, which include:

    (a) Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal;

    (b) Whether there would be a loss of rights granted in the case if it were dismissed rather than converted;

    (c) Whether the debtor would simply file a further case upon dismissal;

    (d) The ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors;

    (e) In assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise;

    (f) Whether any remaining issues would be better resolved outside the bankruptcy forum;

    (g) Whether the estate consists of a "single asset";

    (h) Whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests;

    (i) Whether a plan has been confirmed and whether any property remains in the estate to be administered; and

    (j) Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

*In re BH S&B Holdings, LLC* (Bankr. S.D.N.Y. 2010)(citing Collier on Bankruptcy ¶ 1112.04[6]).

63.     As applied to the Debtor's case, in weighing the factors to determine conversion to a chapter 7, it is clear that the continuance of the Debtor as the Debtor in Possession in his chapter 11 is in the best interests of the estate and the creditors.

64.     Specifically, the Debtor remains in a better position than that of a chapter 7 trustee to continue the management of his assets to best benefit creditors and maximize the Estate's value as an economic enterprise.   The Debtor has an incentive to reduce the costs to the estate and is actively managing his properties to maximize their value.   The Debtor's actions have included an appeal of the yearly property taxes, as well as continued negotiations with ECMS and third-parties to reduce the costs to remediate the Property.

65.     Moreover, creditors stand to receive a greater distribution with the Debtor remaining in control of his estate, as opposed to the appointment of a Chapter 7 Trustee.   The Debtor is prepared to file a disclosure statement and plan which would provide for the full repayment of all unsecured creditors through the sale of the remaining parcels, whereas a Chapter 7 trustee would simply add another layer of fees and the likelihood that creditors would not receive full payment of their claims.

66.     As detailed herein, the Debtor has not engaged in any misconduct or gross mismanagement in the current case.

67.     Further, 11 U.S.C. 1112(b)(2) states that the court must convert or dismiss for cause shown unless:

> (A) there is a reasonable likelihood that a plan will be confirmed... within a reasonable period of time; and
>
> (B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A)-
>
>> (i) for which there exists a reasonable justification for the act or omission; an
>>
>> (ii) that will be cured within a reasonable period of time fixed by the court.
>
> U.S.C. § 1112(b)(2).

17

68.     Previously noted, there is no basis to convert the Debtor's chapter 11 case under 1111(b)(2), as the Debtor is prepared to file a plan and disclosure statement within the next thirty to forty-five days.  It is expected that the plan will provide for the full costs of any necessary remediation of the ranch property, the repayment all outstanding property taxes for all the properties, accrued administrative costs and any verified unsecured claims in full.

### III.   **Appointment of a Chapter 11 Trustee**

69.     Section 1104(a) of the Bankruptcy Code governs appointment of a chapter 11 trustee and provides as follows:

> a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee —
>
> (1)   for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1104(a)

70.     The appointment of a chapter 11 trustee is an extraordinary remedy. *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr.S.D.N.Y.2007).

71.     There is a strong presumption that a debtor remain in possession absent a showing of need for the appointment of a trustee. *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr.S.D.N.Y.1990.

18

72.     It is the burden of the party seeking the appointment of a chapter 11 trustee to show, by clear and convincing evidence, "cause" for the same under § 1104(a)(1), or the need for a trustee under § 1104(a)(2). *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 656 (Bankr.S.D.N.Y.2006)(citing *In re Marvel Entertm't Group, Inc.*, 140 F.3d 463, 471 (3d Cir.1998)).

73.     Although § 1104 requires a bankruptcy court to appoint a trustee if the requirements of the statute are met, a court has wide discretion in considering the relevant facts. I*n re Sharon Steel Corp.*, 871 F.2d at 1226; *In re Adelphia*, *supra*, 336 B.R. at 656 ("The decision to appoint a chapter 11 trustee is a factual determination entrusted to the discretion of the bankruptcy judge.").

74.     When determining if the appointment of a chapter 11 trustee under § 1104(a)(2) is warranted, factors considered include:

> (i) the trustworthiness of the debtor;

> (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation;

> (iii) the confidence-or lack thereof-of the business community and of creditors in present management; and

> (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.

*In re Eurospark Industries, Inc.*, 424 B.R. 621, 627 (Bankr. E.D. N.Y. 2010)

75.     1104(a)(2) 'envisions a flexible standard which allows the court discretion to appoint a trustee when doing so would best serve the parties' and estate's interests. *In re The 1031 Tax Group, LLC*, Case No. 07-11448 (MG). Jointly Administered (Bankr. S.D.N.Y. 10/23/2007) (Bankr. S.D.N.Y. 2007).

76.     The Debtor respectfully submits that the appointment of a chapter 11 trustee is not necessary in this case.  Neither the United States Trustee's Office nor any of the creditors have requested that the Court appoint a chapter 11 trustee to manage the affairs of the Debtor.

77.     Furthermore, the Debtor has previously proven that he can effectively manage his estate more efficiently than third-parties.  In the Debtor's prior bankruptcy proceeding, a receiver was removed based on his continued failures to act with due diligence as to his responsibilities for the estate.  At the same time, the same receiver added additional costs which the Debtor would have been responsible for, but for the Court striking all fees accrued by the receiver and his attorney in the order removing the receiver.  The Debtor has again in this case effectively and cost-consciously managed the estate and has negotiated a short sale, found a buyer and conducted a sale to resolve the largest creditor in the case and is currently in the process of awaiting a purchase offer from a buyer on the last large parcel of the estate.

78.     The Debtor has demonstrated previously and now that he can manage and oversee the affairs of the estate in a fashion designed to maximize the estate's value and minimize costs to the estate for his management oversight.

79.     Similarly, a chapter 11 trustee would inherit a complex situation, wherein an asset of the estate requires remediation to comply with directives from the NYSDEC.

80.     The estimate provided by ECMS was a heightened estimate and far more than what the Debtor was preparing to spend.  The estimate included work that was never expected to be needed or completed.

81.     The Debtor has been diligently working on reducing the overall costs of the remediation as he had planned from the beginning and ECMS has prepared an updated estimate for remediation costs (See **Exhibit F**).

82.     The Debtor has found a contractor, as was his plan in the beginning, which is willing to do the excavation work on the property for little to no cost.  The agreement is that the contractor can take the fill soil once it is tested and cleared.  This agreement will likely reduce the costs of the remediation plan by $200,000 or more.

83.    That Debtor has made progress toward selling the remaining large parcel of land.  At current, the Debtor is awaiting an offer of sale from the buyer of the prior two parcels.  A recent appraisal was done by the prospective buyer and the Debtor is awaiting a written offer based upon that appraisal.  The value of the property is in the range of $500,000 to $700,000.  Upon the sale of this parcel, the Debtor will receive all the necessary funds needed to fund the remediation, pay closing costs and fund a plan to pay his administrative expenses and unsecured creditors.

84.    If the Debtor were to receive the estimated $600,000, as they believe the value of the parcel to be, for the property the Debtor would be able to fund an over estimated remediation cost of $250,000, pay the outstanding property taxes at closing in the amount of $140,000 pay estimated administrative costs of $25,000 and still have $190,000 to fund a plan that would include a full distribution of the outstanding property taxes due on parcel 72-1-47 and further fund a full distribution to the one remaining creditor who filed a proof of claim in the case.  The plan would also include the eventual sale of ranch property, parcel 72-1-47, after it is remediated to fund any further administrative expenses and a further distribution to any possible unsecured creditors, if applicable.  The sale of the large parcel, the remediation of the ranch and the sale of the ranch property can reasonably be accomplished within 8 to 14 months under the Debtor's supervision and with the assistance and cooperation of the Town.  This plan is in the best interests of the estate and the creditors and the most viable plan to keep the costs to the estate to a minimum. Such a plan, if filed by the Debtor, has a legitimate chance of being approved.

85.    Whereas the Debtor is well on his way to addressing the remediation issues, a Chapter 11 trustee would be starting from scratch.  This is not in the best interests of the estate or any of the remaining creditors.  Accordingly, the Court should decline to appoint a chapter 11 trustee and allow the Debtor to remain in control of his Estate.

86.     A dismissal of the case places the parcels back in the hands of Bruce Donahue.   Mr. Donahue was selected by the Town and appointed by the Supreme Court.   He was installed again as receiver in the Debtor's prior bankruptcy for the first year until he was removed by Judge Morris for failing to properly oversee the estate among other factors.   Mr. Donahue was not present for the hearing nor did provide any written statement stating he wished to be appointed receiver again.   At a hearing on the Order to Show cause filed solely by Mr. Donahue's attorney, Judge Grossman of the Putnam Valley Supreme Court appointed him the receiver of properties again.

87.     Mr. Maria, Mr. Donahue's attorney failed to appear in the Debtor's prior bankruptcy yet proceeded to represent the receiver in various state court matters undertaken without appropriate authority from the bankruptcy court providing another basis for Judge Morris to remove Mr. Donahue as the receiver.   Mr. Maria has also failed to appear in this case and/or file a proof of claim for fees he claims to have been awarded in prior state court actions.

88.     Mr. Maria and Mr. Donahue have demonstrated in the past no ability to properly oversee and manage the properties.   The two individuals only succeeded in causing property taxes to go unpaid, wide spread misuse of the properties by neighbors and trespassers, failed to appear and/or defend a foreclosure filed against one of the properties under their control along with accumulating over $200,000 in legal and management fees for services that produced no visible benefit to the estate.   This is not in the best interests of the estate.   The best interests of the estate are served by the Debtor remaining in control of the estate and allowing for the filing and approval of a plan of reorganization that assures funds for the remediation of the ranch property, the full payment of all property taxes owed on the remaining parcels, full payment of administrative expenses and full payment to the remaining creditors.

WHEREFORE, the Debtor respectfully request that the Court (1) deny the Town of Putnam Valley's Motion to dismiss the Debtor's Case; (2) allow the Debtor's Chapter 11 Case to proceed with the Debtor as a Debtor in Possession and (3) grant the Debtor such other and further relief as may be just and proper.

Matthew M. Cabrera, Esq.
M. CABRERA & ASSOCIATES, P.C.
2002 Route 17M, Suite 12
Goshen, New York 10924
Tel.: (845) 531-5474
Fax: (845) 230-6645
Attorney for Debtor

_/s/ Matthew Cabrera_
By: Matthew Cabrera, Esq.

March 2, 2023